**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **CORTNEY AKRIDGE**, | |
| *Plaintiff*, | Case No. 3:13-cv-588 |
| v. | Chief Judge Haynes |
| **RYAN FINNEGAN**, | |
| *Defendant*. | JURY DEMAND |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

COMES NOW Plaintiff Cortney P. Akridge, pursuant to Fed. R. Civ. P. 56 and Local Rule

56.01, and respectfully submits this memorandum of law in support of his motion for partial summary

judgment on Count II of the Amended Complaint against Ryan Finnegan for Defendant's unlawfully

expanded and prolonged seizure of Plaintiff based on factors not supporting individualized,

particularized reasonable suspicion of ongoing criminal activity, in violation of the Fourth Amendment

to the United States Constitution.

**STATEMENT OF FACTS**[1]

Plaintiff Cortney Akridge sued Defendant Finnegan, a Metro Police officer, for a prolonged

*Terry* detention at a traffic stop unsupported by probable cause wherein Defendant failed to diligently

investigate his suspicions. (Am. Compl., Count II).

Defendant Finnegan was a member of the Metropolitan Police Department's "FLEX" squad,

whose goal it is "to interdict crime prior to it happening," primarily through traffic stops. (SUMF ¶¶ 4,

---

[1]     As set forth in Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's
Motion for Partial Summary Judgment ("SUMF"), filed concurrently herewith, the following facts are
undisputed or reflect the version of events most favorable to Defendant.

7-9, 11). Defendant has been lauded by his supervisors as being particularly "proactive." (*Id.* at ¶¶ 12-14). There were no African-American officers on Defendant's West "FLEX" squad. (*Id.* at ¶ 6).

On July 24, 2012, Plaintiff Cortney Akridge had recently graduated from high school and after getting home from work as an unarmed security guard, looked for apartments with three friends, who went to school with him and lived in the same East Nashville public housing development. (*Id.* at ¶¶ 21-26; Merrell Dep. 53:11-21, 54:18-21; Finnegan Dep. 74:6-12, 77:16-17).

Defendant was driving a gold, unmarked patrol car equipped with a computer terminal and GPS but no video camera. (SUMF ¶ 27-29). After observing Plaintiff stop turn in the opposite direction of his indicated turn signal, and that his car's tag showed an East Nashville address, Defendant thought that there "might be more to this stop rather than just a basic stop." (*Id.* at ¶ 37). After following Plaintiff for a block or two and observing Plaintiff not come to a complete stop at a stop sign, he initiated a traffic stop near the Village West/Tennessee Village Apartments. (*Id.* at ¶ 34, 36, 38-39). The traffic stop began at about 6:32, while it was still daylight. (*Id.* at ¶¶ 31, 35).

At the same time, Defendant searched Mr. Akridge's license plate in a law enforcement database. (*Id.* at ¶ 31). No more than two minutes later, the system returned the full registration information for Mr. Akridge's car. (*Id.* at ¶ 56). After initiating the traffic stop, Defendant and other officers noticed that Plaintiff's window tint was "extremely dark," (*id.* at ¶ 32), so that Defendant could only see from the passengers' armpits and above, (*id.* at ¶ 42). Nonetheless, Defendant testified he saw a male in the backseat make arm movements consistent with someone trying to put something behind them or in the seat. (Finnegan Dep. 51:19-23).[2]

Defendant approached Plaintiff and told him he was in a drug- and gang-related area. (*Id.* at ¶ 44). Because Mr. Akridge did not have his physical driver's license on his person, Defendant asked for his name, birthdate, and Social Security number, which Mr. Akridge provided. (*Id.* at ¶ 46). Although

---

[2]    This fact is hotly contested. (*See* Merrell Dep. 130:1-132:3; Decl. of Cortney Akridge ¶¶ 2-5).

he did not notice any drug or alcohol odors or suspect the passengers of any crime, he asked the three "young, male blacks" for their names and other identifying information, which they, too, provided. (*Id.* at ¶¶ 48-51). Defendant asked Plaintiff what they were doing, and Plaintiff responded that they were out riding around looking at apartments and that they had just driven by or through the Tennessee Village Apartments to look at them. (*Id.* at ¶ 52; Finnegan Dep. 77:15-17). Defendant thought that was an inconsistency because despite seeing him pull out of the apartment complex, Mr. Akridge said that they had just driven by or driven through Tennessee Village, yet did not "actually stop and speak with anybody or try to look at an actual apartment. (SUMF ¶ 52; Finnegan Dep. 75: 4-15).

Defendant returned to his patrol car and searched Mr. Akridge's Social Security number at 6:36 p.m. (SUMF ¶ 58). He found no warrants. (*Id.*). During the same minute, Defendant searched Plaintiff in the NCIC national database; the system returned information, including the absence of national warrants and details of Plaintiff's valid driver's license. (*Id.* at ¶¶ 59-61, 65). At 6:38 p.m., Defendant searched for Mr. Akridge in the ARMS database for a second time, and the terminal returned Plaintiff's insignificant arrest record (which did not result in a conviction). (*Id.* at ¶¶ 61, 64, 76).

Defendant gave other "FLEX" officers who had arrived slips of paper with the other passengers' names. (*Id.* at ¶ 67). Between 6:36 p.m. and 6:39 p.m., the officers queried the passengers' information in police databases, returning nothing out of the ordinary. (*Id.* at ¶¶ 69-74, 77-78). Defendant queried another passenger's name at 6:37 p.m.; his last interaction with the law enforcement databases was at 6:38:21 p.m., when he again searched Plaintiff's license plate. (*Id.* at ¶¶ 71-72, 74, 82).

Then, Defendant returned to Mr. Akridge's car to "ask him some more questions and see if he'd give me consent to search the car." (*Id.* at ¶ 84). In a process Defendant characterized as "fairly lengthy," Defendant asked Plaintiff a number of questions, including questions about his work. (*Id.* at ¶¶ 83, 85, 91-93). At one point, Defendant testified that Plaintiff acted nervous and looked over his shoulder to the car when he asked Plaintiff whether there were any weapons in the car. (Finnegan Dep.

3

96:4-9, 104:15-23).[3] Defendant frisked Plaintiff's body because he was concerned he might have a gun, but no contraband was discovered. (SUMF at ¶¶ 96-97, 111).

Plaintiff declined Defendant's request to search his car. (SUMF ¶ 97). Defendant then told Plaintiff to return to his car with the windows rolled up because he was calling "a narcotics dog to do a walk around the vehicle." (*Id.* at ¶¶ 98-99). At 6:44 p.m., Defendant called a Metro canine officer, declaring that he had "one refusing to consent." (*Id.* at ¶ 100). At 6:50 p.m., Defendant wrote Mr. Akridge a ticket for civil traffic violations. (*Id.* at ¶¶ 105, 109). Based on the canine officer's GPS data, he arrived at the scene of the traffic stop 14-21 minutes later. (*Id.* at ¶ 101). Another officer frisked Plaintiff's body a second time, and he was made to wait outside the car for the canine unit to arrive. (*Id.* at ¶¶ 112-13). The canine did not "hit" on Plaintiff's car, and Defendant gave Plaintiff the traffic citation. (*Id.* at ¶¶ 122, 127). Defendant declared his unit "free"—and the stop over—at 7:08:29 p.m. (*Id.* at ¶ 128). While Defendant was not able to "specify as to exactly what they were up to," (*id.* at ¶ 134), he confided in another officer at the scene of the traffic stop that he believed a backseat passenger had a gun, (Potts Dep. 57:20-24).

From start to finish, the stop lasted no less than 34 minutes. (SUMF ¶ 31). Defendant had sufficient information to write a traffic ticket no later than 6:38 p.m. The time between Defendant's calling the narcotics dog at 6:44 p.m., and the unit's arrival on scene, was 14-21 minutes. (*Id.* at ¶ 101).

Defendant cited the following factors as providing reasonable suspicion to extend the traffic stop: Plaintiff's vehicle changing directions before the stop; "the tag not coming back to the neighborhood[;] the backseat passenger that appeared to be trying to conceal something[;]" "the evasiveness of the apartment question to the driver[;] no one had an ID on them[;]" "the driver at least had a brother that had gang ties and that the occupants had had some criminal history[;] "the apartment

---

[3]     This fact is also hotly contested. Plaintiff maintains that he answered Defendant truthfully, did not exhibit any sort of demeanor change, and did not glance over his shoulder. (Akridge Decl. ¶¶ 6-8).

complex near the stop" had "a lot of drug and gang activity[;]" and Plaintiff's wearing his Securitas security guard uniform that "appeared way too big for him." (SUMF at ¶ 86).

**ARGUMENT**

Summary judgment is proper where the pleadings and discovery materials "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only genuine disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Here, all material undisputed evidence, and even the evidence that is disputed, when viewed in the light most favorable to Defendant, establishes as a matter of law that: (1) Defendant expanded the scope and duration of the original purpose of the seizure of Plaintiff, to issue him a traffic ticket; and (2) Defendant's prolongation of the stop was not supported by facts providing him with objectively reasonable suspicion that Plaintiff was involved in criminal activity.[4]

**I.     Defendant Extended Both the Scope and Duration of the Traffic Stop.**

As a threshold matter, Defendant's seizure of Mr. Akridge for Fourth Amendment purposes began when he activated his emergency lights, and Mr. Akridge pulled to the side of the road. It is well-settled that a traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255 (2007); *see also Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009).

A police officer must have probable cause to make a stop for a civil infraction or reasonable suspicion of an ongoing crime to make a stop. *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n. 6 (6th Cir. 2004). Plaintiff assumes, for the purpose of this motion for summary judgment, that Defendant had

---

[4]     Courts consider a two-prong inquiry when evaluating the legality of an investigatory detention, (1) whether the stop was supported by reasonable suspicion; and (2) "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993).

5

probable cause of civil traffic violations to support the initial traffic stop of Mr. Akridge. However, probable cause for a traffic stop does not entitle the police to detain a person while they go on a fishing expedition. *See United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) ("Probable cause to believe that a *traffic* violation has occurred is unlike probable cause to believe that a *criminal* violation has occurred and thus does not allow the police to detain a suspect indefinitely.") (emphases added); *see also Knowles v. Iowa*, 525 U.S. 113, 116-18 (1998) (discussing the constitutional limitations of a traffic stop); *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007); *United States v. Freeman*, 209 F.3d 464, 470 (6th Cir. 2000).

The Supreme Court has held since the "purpose" of a typical traffic stop is "limited and the resulting detention [is] quite brief," *Delaware v. Prouse*, 440 U.S. at 653, the reasonable-suspicion analysis under *Terry* is the proper inquiry. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002). Therefore, as with *Terry* stops, "the [traffic] stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (quoting *Terry v. Ohio*, 392 U.S. 1, 29 (1968)). "[A]ny subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference." *Davis*, 430 F.3d at 353 (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000)). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439. "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case," but the scope and duration of the stop must not be "longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

6

In addition to the requirement that a seizure must be justified at its inception, the seizure must also be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008) (citing *Terry*, 392 U.S. at 19-20).

Importantly, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). More specifically, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*; *see also Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185-86 (2004) (noting that a "seizure cannot continue for an excessive period of time").For those reasons, while an officer may stop a vehicle when he or she has probable cause to believe a traffic violation occurred, "once the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) (internal quotations omitted); *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). Accordingly, a court can find that a traffic stop has been prolonged even when the civil traffic violation ticket has not yet been written, as was the case here, "[b]ecause a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded." *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012).

Accordingly, although, *arguendo*, Defendant Finnegan's initial stop of Plaintiff may have been valid, Defendant's continued seizure of Mr. Akridge was not supported by reasonable suspicion after Defendant had sufficient information to write Mr. Akridge a ticket. Here, Defendant Finnegan unlawfully extended the scope *and* duration of the initial stop without separate, articulable reasonable suspicion. Because clearly established Fourth Amendment jurisprudence did not support Defendant's

unreasonable decision to prolong the traffic stop, Plaintiff is entitled to judgment in his favor as a matter of law.

Taking the facts in the light most favorable to Defendant, Defendant had sufficient information to write Mr. Akridge a traffic ticket by 6:38 p.m., the time by which Defendant had verified that Mr. Akridge's driver's license was valid, (SUMF ¶¶ 59, 65), that his vehicle was registered to him at his correct address and was otherwise unremarkable, (*Id.* at ¶ 56), checked Mr. Akridge's information multiple times in law enforcement databases, (*id.* at ¶¶ 56, 58-62, 82), determined that he was not the subject of any warrants, (*id.* at ¶¶ 58, 60), and that Mr. Akridge did not seem impaired or smelled of alcohol or drugs. (*id.* at ¶ 51). It is undisputed that Defendant asked at least a "moderate" number of questions of Mr. Akridge after approaching his vehicle. (*Id.* at ¶ 83). Despite this fact, Mr. Akridge and his passengers were detained an additional 30 minutes,[5] forced to undergo additional searches, and made to remain on a curb while waiting for the canine to be summoned. Sometime thereafter, Defendant returned to Mr. Akridge's vehicle and asked more questions, eventually calling for a narcotics-detecting dog and detaining Plaintiff until the canine sniff revealed that Plaintiff possessed no narcotics.[6] (*Id.* at ¶ 122). At 6:38 p.m., the time when Defendant had all the information necessary to write a ticket, "the purpose of the traffic stop would have been completed almost immediately, in the time necessary for [the officer] to issue the citation and send [Plaintiff] on his way." *See Blair*, 524 F.3d at 752; *see also Torres-Ramos*, 536 F.3d at 550 (the question of when a traffic stop turns into a Fourth Amendment concern is "at what point in time did the purpose of the traffic stop end and the detention of the driver and the occupants … begin?").

---

[5]    Taking the facts in Defendant's favor, the stop concluded at 7:08 p.m. (*Id.* at ¶¶ 31, 128).
[6]    Defendant admits that Plaintiff was not free to leave, and therefore, remained seized, while waiting for the canine. (*Id.* at ¶ 110).

When Defendant Finnegan ceased his investigation of the traffic offense, began asking questions about criminality, had officers frisk his body twice (including at least shaking his pants from the belt loops), and eventually called for drug-detecting dog, Defendant expanded the scope of the traffic stop beyond the original purpose, requiring separate reasonable suspicion that was altogether absent in this case, as explained below. Diverting his attention from traffic-related questions reset the *Terry* reasonableness clock. *See United States v. Johnson*, 482 F. App'x 137, 143-48 (6th Cir. 2012) (Boggs, J.) (police did not have reasonable suspicion to justify extending traffic stop by 19 minutes to bring in a drug-sniffing canine).

While *asking* Mr. Akridge for permission to search his car did not unreasonably extend the stop beyond its allowable scope in and of itself, *see United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003), Defendant's statement and follow-through that he would call a canine to the scene to perform a sweep did "extend the scope and duration of the stop beyond that necessary to issue a citation." *Blair*, 524 F.3d at 752 (reversing district court's denial of motion to suppress where police extended scope of stop to call canine after driver appeared nervous, was seen reaching under the seat).[7] As explained below, because Officer Finnegan "had not developed reasonable suspicion of criminal activity by that point," the remainder of the stop violated the Fourth Amendment. *Id.*[8]

---

[7]    Notably, the Sixth Circuit's decision in *Blair* was on appeal from the district court's denial of the defendant's motion to suppress, requiring the Court of Appeals to review the record in the light most favorable to the government, as is the standard here in Plaintiff's motion for summary judgment. *See Id.* at 748.

[8]    Defendant also prolonged the scope and duration of the traffic stop by insisting on identifying all of Plaintiff's passengers and looking up all their information in law enforcement databases. Defendant wanted to find out "exactly what they were up to," (Finnegan Dep. 102:2-3), and thought it was important for a "FLEX" officer such as himself to identify all the passengers in the vehicle. (SUMF ¶ 47). However, Defendant had no authority to extend the stop to inquire of the identities of the three passengers and confirm their information in police computers. Tennessee has no so-called "stop-and-identify" statute. While some states have passed statutes requiring a person to provide identification in the course of a *valid* investigatory detention, Tennessee is not one of them. *See Hiibel*, 542 U.S. at 183 ("In other States, a suspect may decline to identify himself without penalty."); *see also United States v. Henderson*, 463 F.3d 27, 45-46 (1st Cir. 2006) (quoting *Brown v. Texas*, 443 U.S. 47, 52 (1979)) ("well established that a police officer cannot stop" a person and "demand identification 'without any

If the officer has reasonable suspicion that criminal activity is afoot, he may extend a traffic stop long enough to confirm or dispel his suspicions, but any such extension itself must be limited in scope and duration. *Johnson*, 482 F. App'x at 143. Moreover, the officer must "diligently" pursue a course of investigation "likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [plaintiff]." *Id.* at 144 (quoting *Davis*, 430 F.3d at 354).

Though he could have written a traffic ticket to Plaintiff at 6:38 p.m., Defendant instead called a canine officer to the scene by radio at 6:44 p.m., saying he had "one refusing to consent." (SUMF ¶ 100). He instead *wrote* the traffic ticket at 6:50 p.m., but did not hand Mr. Akridge the citation until approximately 19 minutes later. (*Id.* at ¶¶ 109, 128).

A 19-minute delay under these circumstances violates the Fourth Amendment. The scope and duration of the extended stop did not evince that Defendant "diligently" pursued his investigation of Plaintiff. The police may not slow-walk an investigation in order to prolong a stop to wait for a canine, as the officer did here. *See Blair*, 524 F.3d at 754 (13-minute delay "hardly suggests that 'the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly'") (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)); *see also Caballes*, 543 U.S. at 407-08.[9] Defendant suspected Plaintiff of possessing a gun, yet he called for (and had Plaintiff wait for) a narcotics-detecting dog. *Blair*, 524 F.3d at 753 n. 3 ("Although we need not reach the question of whether the prolonged detention was reasonable in its scope, we note our concern in the thirteen-minute delay between the stop's extension and the canine unit's arrival on the scene.").[10]

_____

specific basis for believing he is involved in criminal activity," and holding that the officer's demand "expanded the scope of the stop, changed the target of the stop, and prolonged the stop").

[9]     Courts have held that a stop may be prolonged even though a citation has not been fully written. *Stepp*, 680 F.3d at 662; *United States v. Bonilla*, 357 F. App'x 693, 697 (6th Cir. 2009). In this case, however, the citation was written at 6:50 p.m. (SUMF ¶ 109).

[10]     Taking the facts in the light most favorable to Defendant Finnegan, he called for the canine at 6:44 p.m., and the canine arrived at 6:58 p.m., 14 minutes later. (SUMF ¶¶ 100-101).

It is clear that Defendant was not diligently investigating his suspicion of a weapon. *Compare* (SUMF ¶¶ 89, 98, 103, 123; Finnegan Dep. 96:13-15 ("I said, okay, go have a seat inside the vehicle and I'm going to call a K – I think I called it a *narcotics* dog to do a walk around the vehicle."), 105:12-13 ("I told him, I said, okay, we'll call for a *narcotics* dog to do a walk around of your vehicle."), 115:6 ("*narcotics* dog was here"), 116:16 ("*narcotics* dog"), 134:18-22 (Defendant's knowledge is that the canine on the scene is trained only to search for drugs, not guns) (emphases added), *with* SUMF ¶¶ 107-108, 111, 123; Finnegan Dep. 134:11-13 ("We generally thought that there was a gun in the car, we just couldn't find it because we weren't able to search the car."). Defendant testified under oath that he did not know what sort of materials the canine could detect and called that information "out of [his] realm." (Finnegan Dep. 135:5-10). Additionally, Metro notes on its website (and Facebook page) that its canines can detect narcotics and explosives, but not guns. (Exhibit A). Calling a drug-detecting dog to the scene of a suspected weapons-related investigation hardly bespeaks of Defendant's diligence and belies that he was pursuing a course of investigation "likely to confirm or dispel" his "suspicions quickly." *Davis*, 430 F.3d at 354.

Moreover, one of the factors Defendant considered as critical in prolonging the traffic stop (movements by the backseat passenger) did not involve Plaintiff at all, but rather one of his backseat passengers. (Finnegan Dep. 60:20-23, 70:4-8, 86:8-9). It is well-settled that reasonable suspicion must be *particularized* to the person whom the police officer is investigating. *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008).

Therefore, Defendant's conduct in calling for a narcotics dog to a suspected firearms scene and conflating Plaintiff's passenger's alleged conduct with Plaintiff himself demonstrates that Defendant's conduct was not "reasonably related in scope to the situation at hand … judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Garza*, 10 F.3d at 1245. *See also Caballes*, 543 U.S. at 408-09 (canine sniff not supported by reasonable

suspicion violates Fourth Amendment "prolong[s the traffic stop] beyond the time reasonably required to complete [the] mission" of issuing ticket).

## II. Taking the Facts in the Light Most Favorable to Defendant, Defendant's Expansion of the Scope and Duration of the Traffic Stop Was Not Supported by Reasonable Suspicion and Therefore Violated the Fourth Amendment.

Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened during the stop to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot." *Hill*, 195 F.3d at 264; *see also Bailey*, 302 F.3d at 657-58; *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999); *Davis*, 430 F.3d at 352 (investigative detention must be supported by reasonable suspicion of criminal activity); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Thus, when Defendant ceased pursuing the original purpose of the traffic stop and began investigating Plaintiff for crimes, he was required to have reasonable suspicion of criminality, "regardless of how short the detention was." *Bonilla*, 357 F. App'x at 698 (citing *United States v. Urrieta*, 520 F.3d 569, 578 (6th Cir. 2008) ("Under the Fourth Amendment, even the briefest of detentions is too long if the police lack a reasonable suspicion of specific criminal activity.")). The officer must, in other words, be able to show "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Terry*, 392 U.S. at 27). "The Fourth Amendment does not allow a detention based on an officer's 'gut feeling' that a suspect is up to no good." *Urrieta*, 520 F.3d at 578.

Defendant Finnegan identified the following factors as providing him with reasonable suspicion that criminal activity involving Plaintiff was afoot: (1) Plaintiff's vehicle registration (East Nashville public housing) was not in the part of town where he was stopped (The Nations); (2) the backseat passenger appeared to Defendant to be trying to conceal something, either behind him or under the seat; (3) it appeared to Defendant that Plaintiff was evasive concerning whether he had driven through

12

the Village West Apartments; (4) Plaintiff had a brother who had gang ties; (5) some of the occupants had some criminal history; (6) the apartment complex near the stop had "a lot of drug and gang activity;" and (7) Plaintiff's Securitas security guard uniform "appeared way too big for him." (SUMF ¶ 86).[11] Taken together, these factors do not amount to reasonable suspicion. While courts consider the totality of the circumstances to determine reasonable suspicion, they do analyze the "factors separately in order to explain why they were insufficient in the aggregate." *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001).

---

[11]    Defendant also testified that he noticed that prior to the initiation of the traffic stop, Plaintiff turned in the opposite direction from the direction of his turn signal, which, Defendant Finnegan testified, raised in his mind that there "might be more to this stop rather than just a basic stop." (SUMF ¶ 37).

However, Defendant's analysis glosses over the fact that he was driving an *unmarked* patrol car that day. (*Id.* at ¶ 27). In any event, innocent avoidance does not lead to reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 275 (2002); *Keith*, 559 F.3d at 505-06 (similar conduct does not contribute to reasonable suspicion).

Additionally, Defendant separately said that none of the passengers had an ID on them, which also caused him suspicion. However, as discussed at n. 8, there is absolutely no legal requirement that a passenger have identification in Tennessee. This factor is therefore not probative of anything.

In his field interview report of Plaintiff, Defendant also conclusorily stated that Plaintiff seemed "nervous," which, of course, is not an "articulable fact." In any event, nervousness around law enforcement is not an important factor and is "inherently *unsuspicious*." *Urrieta*, 520 F.3d at 577 (emphasis in original). "[F]actors such as a person's nervousness … while part of the reasonable suspicion analysis, are given little weight." *Johnson*, 482 F. App'x 145 (quoting *United States v. Samuels*, 443 F. App'x 156, 161 (6th Cir. 2011)); *Arvizu*, 534 U.S. at 275-76. *See also United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (nervousness is an "unreliable indicator, especially in the context of a traffic stop" because "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear.") (internal citations omitted). As the Sixth Circuit held prior to the traffic stop of Plaintiff, "Especially, where, as here, the 'nervous indicators' an officer cites are such relatively commonplace behaviors as *eye contact*, apprehensiveness while handing over a license, sweating, forgetting to provide paperwork, standing, and *looking back and forth* between two officers, a court risks impaling the [plaintiff] on Morton's Fork." *Johnson*, 482 F. App'x at 145. "Nervous indicators are weak indicators in the traffic-stop context." *Id.* (suppressing evidence where defendant exhibited several nervous behaviors, said he was taking a vacation but possessed unconventional luggage, possessed industrial-strength degreaser, was driving outside the geographical limitations of his rental-car contract, and had prior felony convictions).

Moreover, when asked under oath to specify all the facts on which Defendant relied to determine that reasonable suspicion supported his prolongation of the stop, Defendant did not mention either of these factors and instead mentioned only the seven noted above. (SUMF ¶ 86). Defendant was given several opportunities to add or clarify any of those factors, which he declined to do. (Finnegan Dep. 86:23-88:7, 94:14-16).

The first factor, that Mr. Akridge's vehicle was registered to a different part of town than where he was looking for apartments, should not be considered at all. Aside from obviously implicating the right to travel in one's own city, such an observation stems from a pernicious understanding of who "belongs" in which neighborhood. Even driving out-of-state plates—let alone plates registered to a different part of the same city—is consistent with *innocent* behavior and not probative of reasonable suspicion. *Bonilla*, 357 F. App'x at 698; *Urrieta*, 520 F.3d at 576-77 ("travel between population centers is a relatively weak indicator of illegal activity"); *United States v. Wright*, 856 F. Supp. 2d 736, 743 (E.D.N.C. 2012); *United States v. Saperstein*, 723 F.2d 1221, 1229 (6th Cir. 1983) (travel to and from drug source city "inherently unsuspicious" and should not be considered); *see also United States v. Huguenin*, 154 F.3d 547, 556-58 (6th Cir. 1998).

The second factor Defendant relied on, that he saw Plaintiff's backseat passenger make movements appearing consistent with trying to conceal something, is more significant but still does not amount to reasonable suspicion as a matter of law, either when evaluated individually or with the other factors. That one of the backseat passengers moved his arm in a motion consistent with "stuffing" something under the seat is hotly contested. It is implausible that Defendant observed such a hand motion especially since he (and other officers on the scene) testified that Plaintiff's window tinting was "extremely dark," (SUMF ¶ 32), that he could only see part of the passenger's arm, (*id.* at ¶ 42), and officers could not discern even the race, gender, or clothing of the backseat passengers until the window was opened. (*Id.* at ¶ 43; Picchiottino Dep. 36:23-37:6).[12]

Assuming for purposes of this motion that Defendant somehow did see such a motion, such movement does not amount to reasonable suspicion. *United States v. Sawyers*, 74 F. Supp. 2d 784, 789-

---

[12] Additionally, passenger Robert Merrell and Plaintiff Akridge have both testified that no such movements took place. (Akridge Decl. ¶¶ 2-5; Merrell Dep. 130:4-132:3). However, assuming for this motion that such a stuffing motion occurred, it, in combination with the other extremely minor factors Defendant has cited, do not amount to reasonable suspicion.

14

90 (M.D. Tenn. 1999) (evasive hand gestures alone, and in combination with other factors, do not provide reasonable suspicion for *Terry* frisk); *Blair*, 524 F.3d 753 (reaching under seat, even in combination with other factors, insufficient to establish reasonable suspicion); *United States v. Clay*, 640 F.2d 157, 158 (8th Cir. 1981); *United States v. Davis*, 554 F. App'x 485 (6th Cir. 2014) (furtive hand movements in and out of bulging pockets, even in combination with other factors, not sufficient). As the court in *Davis* pointed out, reaching, stuffing, or other furtive movements is often "ambiguous and subject to many different interpretations," *id.* at 490, such as a person reaching for a cell phone.[13]

At the most, *arguendo*, under these circumstances, this passenger's conduct provided reasonable suspicion to perform a *pat-down* for officer safety of that passenger pursuant to *Terry* (which they ultimately did here, yet the pat-down produced nothing), *see United States v. Tillman*, 543 F. App'x 557, 562 (6th Cir. 2013), *Sawyers*, 74 F. Supp. 2d at 789-90, not to extend and prolong the *traffic stop of Plaintiff* to trawl for evidence of narcotics.[14] Moreover, that one of Mr. Akridge's *backseat passengers* supposedly made such a movement does nothing, without additional, articulable facts, to tie *Mr. Akridge* to ongoing criminal conduct. *Johnson*, 620 F.3d at 692 (reasonable suspicion must be individualized to each person stopped); *see also Florida v. J.L.*, 529 U.S. 266, 272 (2000) (suspicion must attach to a "determinate person"); *United States v. Hudson*, 405 F.3d 425, 438 (6th Cir. 2005).

The next factor, that Mr. Akridge seemed "evasive" in answering questions about why he had driven through the Village West/Tennessee Village Apartments, should not be considered at all in the reasonable suspicion calculus. It cannot be disputed that Defendant testified he could not remember

---

[13]     Here, there is testimony suggesting that is exactly what occurred. (Merrell Dep. 131:3-132:3). Of course, the Court need not consider this possible explanation since for the purposes of this motion, the version of the facts most favorable to Defendant is to be believed.

[14]     If that were not enough, Defendant's undisputed testimony controverts Defendant's now-alleged concerns of officer safety or a true belief that this passenger was armed: Q: You thought there might be a gun in the car and you left the three passengers in the car and put Mr. Akridge back in the car?" A: "Yes." (SUMF ¶ 108).

Plaintiff's "exact terminology" concerning the highly fact-intensive question of whether Mr. Akridge had lied about visiting the apartments. (Finnegan Dep. 76:22). At best, this factor is equivocal because it is subject to varying interpretations. Specifically, Defendant testified that he observed Plaintiff drive out of the apartments, but he also testified that Plaintiff told him that he was just "driving by." (Finnegan Dep. 75:21-25). Defendant was apparently unsatisfied that Mr. Akridge did not "actually look at an apartment," (Finnegan Dep. 75:6-7), try to "stop and speak with anybody or try to look at an actual apartment," (*id.* at 75:14-15), or go to a "showing," (*id.* at 75:23-24). Instead, Plaintiff said he was "just driving by," (*id.* at 75:25; SUMF ¶ 52).[15] Defendant's own undisputed testimony is the quintessence of a "hunch," which is never appropriate in the reasonable-suspicion analysis, which requires that the facts supporting an officer's decisions to continue detention to be articulable. *Smith*, 594 F.3d at 536-37.

Officer Finnegan was not happy with the way Mr. Akridge answered his questions, but an "[o]fficer['s] . . . dissatisfaction with [plaintiff's] response to his question, absent any indication of criminal activity, is not sufficient to generate a reasonable and articulable suspicion." *United States v. Goodwin*, 202 F.3d 270 (6th Cir. 2000). *Accord United States v. Mesa*, 62 F.3d 159, 161-62 (6th Cir. 1995) (dissatisfaction with "claimed discrepancy" in response insufficient). Moreover, Mr. Akridge's innocuous response (supported by Defendant's own retelling of Plaintiff's words – that he and his

---

[15]     *See also Id.* at 77:8-78:5 (emphasis added):

A: . . . I asked him, where he was – why they're riding around. And he said, we're looking for an apartment, looking for somewhere to rent. I said, okay. I said -- I don't know if I asked him if he looked at Tennessee Village or how that came up, but when confronted with it, he didn't -- it's hard to remember exactly the words he and I both used in our conversation, but I remember what I took away from our initial interaction was that *I felt* he was not telling me he came from the complex, but it was clear he had just driven past it on Tennessee Avenue, that he had never actually entered the complex.

Q: But to your recollection, he never actually told you that, that he had just driven by on Tennessee Avenue and never entered the complex?

A: No, he never specifically said that, no.

16

friends were out looking for an apartment) did not suggest any illegal activity was afoot. At most, this factor is equivocal and does not contribute at all to the reasonable-suspicion analysis.

The next factors on which Defendant Finnegan relied upon in support of his continued detention of Plaintiff is also unsettling. Officer Finnegan was concerned that Plaintiff's brother was identified as being involved in gang activity and that some of the occupants had criminal histories.[16] Neither of these facts, considered together and with the remainder of the asserted justifications, amounts to reasonable suspicion. The Sixth Circuit has held that a *past* criminal record "does not create a reasonable suspicion that criminal activity is *currently* afoot." *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (past criminal history, nervousness, "illogical" travel route, and "furtive" gestures insufficient to establish reasonable suspicion); *Johnson*, 482 F. App'x at 148 ("The fact that he had committed crimes in the *past*, while it has a place in the reasonable-suspicion analysis, is not, without more, strong evidence of criminal activity in the *present*.") (emphasis in original).

When the Court *has* held that a motorist's criminal history could be used to establish reasonable suspicion, it was only when those histories were specific and related to the same suspicions that the officer was developing at the time of the traffic stop. *Stepp*, 680 F.3d at 667. The undisputed evidence in the record, gleaned from the computer results of the Metro officers on the scene searching for the occupants, reveals that only Mr. Akridge had any criminal history—one misdemeanor trespass charge that did not result in a conviction. (SUMF ¶ 61). Neither Plaintiff nor any of his passengers had been convicted of any weapons charges. (ARMS Message ID Nos. 77248706-07, 77248871, 77248736).

Attempting to paint Plaintiff with his brother's brush is also a tremendously weak indicator— if it is even one at all—that criminal activity involving Plaintiff was "afoot." The notion of "guilt by association" is completely foreign to the Fourth Amendment and the American system of justice.

---

[16]    In actuality, of the four occupants, only Mr. Akridge had any arrests (one misdemeanor trespass). He was not convicted of that crime, however.

Importantly, the Sixth Circuit agrees: "[R]easonable suspicion does not attach . . . solely through association with others with whom reasonable suspicion has attached." *Daughtery v. Campbell*, 935 F.2d 780, 786 (6th Cir. 1991).[17] *See also United States v. Monteiro*, 447 F.3d 39, 43 (1st Cir. 2006); *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994) (collecting cases). Plaintiff's brother was not linked to any crime, nor was Plaintiff. The connection between the vehicle occupants' and Plaintiff's brother's criminal history and the continued detention of Plaintiff was woefully attenuated.

Defendant's next justification for prolonging the stop is that Plaintiff was driving through a "high-crime" area, that the apartment complex he was driving past was known for drugs and gangs. (SUMF ¶¶ 48, 86). However, even if Plaintiff was in a "high-crime" apartment complex immediately before the stop (or was merely driving through the neighborhood), clearly established law does not establish reasonable suspicion to justify a *Terry* stop. *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) (citing *Wardlow*, 528 U.S. at 123). While the Court may consider presence in a high-crime area as one of the factors (unlike some of the other factors Defendant has offered, which are not probative of suspicion at all), it is also a relatively weak indicator, as it may apply to many innocent people. *Blair*, 524 F.3d at 750 (location "high-crime" area, together with late hour, does not establish reasonable suspicion).

But there is even less here than in *Blair*, where the court also found a lack of reasonable suspicion; in this case, the stop occurred during the daytime, not at a late hour. (SUMF ¶ 35). *Id.* at 750-51. *See also Patterson v. City of Cleveland*, 173 F.3d 429 (6th Cir. 1999) (presence in high-crime area, plaintiff exchanging something with someone, and walking away from police officer did not create reasonable suspicion); *Keith*, 559 F.3d at 505 (high-crime area late at night, glancing in officer's

---

[17]     This type of evidence is so weak that it would not likely even be admissible at trial. *See, e.g., United States v. Polasek*, 162 F.3d 878, 885 (5th Cir. 1998) ("Eppes's statements that Polasek had done tile work for persons later convicted of odometer fraud showed only that she associated with criminals. It was therefore inadmissible guilt by association evidence.").

18

direction, then moving out of sight of police does not create reasonable suspicion); *United States v. Townsend*, 305 F.3d 537, 542-45 (6th Cir. 2002) (holding that officers did not have reasonable suspicion to justify extending traffic stop based on defendant's cooperative behavior, late-night travel from a known source for narcotics, possession of three cell phones, presence of bible, what appeared to be rolls of currency, defendant's criminal history, indicators of nervousness, food wrappers and clothing in car, and driver's not being the registered owner of the car).

Defendant's final factor is that Plaintiff's security guard uniform "appeared" too big for him. (SUMF ¶ 86). First, this conclusory observation is, of course, not based on specific, articulable facts, as is required for a proper *Terry* analysis. Second, baggy clothing is an inaccurate predictor of criminal activity. *See United States v. Marcelino*, 736 F. Supp. 2d 1343, 1350 (N.D. Ga. 2010) (loose, baggy clothes in gang colors insufficient standing alone to support *Terry* stop); *United States v. Davis*, No. H-08-028, 2008 WL 4372705 (S.D. Tex. Sep. 22, 2008) (some "gang connection," presence in "high-crime" area, "some type" of criminal history, nervous appearance, baggy clothing, clutching waist area of sagging shorts, and visible bulge in clothing does not amount to reasonable suspicion when considered together). Third, any concern that Mr. Akridge was concealing a weapon on his person should have been readily dispelled by the two pat-down searches he was subjected to. (SUMF ¶¶ 95, 111). Fourth, and most importantly, Defendant was not concerned that Plaintiff had a weapon on his person in any event. (Finnegan Dep. 100:7-13).

"Although the government has pointed to several factors, present in this case, which we have recognized as valid considerations in forming reasonable suspicion, they are all relatively minor and, in many cases, are subject to significant qualification. The fact of the matter is that this case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases. We hold that the officers lacked reasonable suspicion to detain the defendants until the canine unit arrived." *Townsend*, 305 F.3d at 545.

> [E]ven where the government points to several factors that this court has recognized as valid considerations in forming reasonable suspicion, they may not together provide reasonable suspicion if they are all relatively minor and subject to significant qualification, particularly where the case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases.

*Stepp*, 680 F.3d at 665 (quoting *Bell*, 555 F.3d at 540; *Townsend*, 305 F.3d at 545) (internal citations and quotation marks omitted); *see also United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (surveying cases). Much of the conduct Defendant points to "lacks any strong indicators of criminal conduct," aside from minor conduct common when any driver is pulled over and interrogated. *Bonilla*, 357 F. App'x at 699. Many of the factors Defendant identified should not be considered at all by the Court. Because Defendant did not possess *reasonable* suspicion—*specific*, articulable facts particularized to *Plaintiff*—Officer Finnegan lacked a constitutional justification for his actions when he shifted his attention from the traffic citation and began investigating other crimes.

There is nothing *per se* illegal about a police unit, such as the "FLEX" unit, that concerns itself with "proactive" patrol and "interdict[ing] crime prior to it happening." (SUMF ¶¶ 7-8). However, under the facts of this case, where Defendant detained Plaintiff to "dig"—his words, (Finnegan Dep. 101:22, 117:10)—for evidence to implicate him in criminal activity, when none, in fact, existed, such a program borders on Orwellian. At best, Defendant's prolonged detention of Plaintiff was based on merely "an ill-defined hunch" that was not based upon a "particularized and objective basis for suspecting the particular person . . . of criminal activity." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). Defendant's "fishing expedition," however well-intentioned, violated the Fourth Amendment. *Mesa*, 62 F.3d at 162.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court grant his motion for partial summary judgment on Count II of the Amended Complaint.

Dated: September 22, 2014                              Respectfully submitted,


s/Tricia Herzfeld

Tricia Herzfeld (BPR No. 26014)

Elliott Ozment (BPR No. 4331)

OZMENT LAW

1214 Murfreesboro Pike

Nashville, TN 37217

(615) 321-8888 (office)

(615) 321-5230 (fax)

tricia@ozmentlaw.com

*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Tricia R. Herzfeld, one of Plaintiff's attorneys, certify that I caused a copy of the foregoing document to be served by operation of the Court's Case Management/Electronic Case Files (CM/ECF) system upon the following attorneys of record on Monday, September 22, 2014:

Keli J. Oliver
Derrick C. Smith
R. Alex Dickerson
Metro Courthouse, Suite 108
P.O. Box 196300
Nashville, TN 37219

Respectfully submitted,


<u>s/Tricia Herzfeld</u>
Tricia Herzfeld (BPR No. 26014)
OZMENT LAW

*One of Plaintiff's Attorneys*

22